AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

**1826 24th Street, N.E.**
**Apartment 102**
**Washington, DC**

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER:

(Further described below)

I    **David Swinson**    being duly sworn depose and say:

I am a(n)  **Detective David Swinson with the Metropolitan Police Department (MPD)**  and have reason to believe
(Official Title)

that ☐ on the person of or ☒ on the property or premises known as   (name, description and or location)

**1826 24th Street, NE, Apartment 102, Washington, DC.** (as further described in , the attached affidavit in support of search warrant incorporated fully herein), **including ATTACHMENTS A and B.**

in the United States, there is now concealed a certain person or property, namely (describe the person or property to be searched)

**items of computer evidence and other items of evidence as further described in the attached affidavit in support of search warrant incorporated fully herein., (including ATTACHMENTS A and B)**

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
**evidence and instrumentalities**

concerning a violation of Title  **18**  United States Code, Section(s) **§§ 2319, 2319(B), 2  and 17 U.S.C. 506(a)** .
The facts to support a finding of Probable Cause are as follows:

**SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN**

Continued on the attached sheet and made a part hereof.    ☒ YES   ☐ NO

**Thomas Hibarger**
**Fraud and Public Corruption**
**(202) 514-7385**

**Signature of Affiant**
**David Swinson, Special Agent**
**Metropolitan Police Department (MPD)**

Sworn to before me, and subscribed in my presence

_____
Date

at Washington, D.C.

_____
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF ARREST AND SEARCH WARRANTS

1. **Your affiant**, David Swinson, is a Detective with the Metropolitan Police Department ("MPD") in Washington, DC. I have been a sworn member of MPD for over thirteen years. I am currently assigned to the Metropolitan Police Department's Special Investigations Bureau/Major Crimes to investigate serial burglary offenses, fencing operations and major crimes. I have drafted affidavits in support of both arrest and search warrants that have led to the arrest of multiple felons and the recovery of crucial evidence. My investigations have resulted in the arrest of numerous serial burglars, and subjects who were trafficking in stolen property, narcotics and counterfeit goods. Your Affiant also has experience with counterfeit DVD movies and counterfeit music CDs. Prior to my career in law enforcement, your Affiant was in the film industry for several years working in development and production.

2. This affidavit is in support of an application for an arrest warrant for **Tony Edward DUGGER, also known as Tony Dougger, (hereinafter DUGGER)** as well as for search warrants in connection with an investigation into the activities of **DUGGER**. The locations to be searched are further specifically described in the accompanying "Attachment A." As provided below, there is probable cause to believe that **DUGGER** is reproducing and distributing for commercial and private financial gain copyrighted movies, including movies that are still playing only in theaters, in violation of federal criminal copyright infringement statutes. Victims of this criminal organization include member companies of the Motion Pictures Association of America (MPAA).

3. Based on my experience and information that I have obtained from others experienced in such investigations, I have learned that individuals who participate in copyright infringement through the commercial distribution of unauthorized copies of movie DVDs typically maintain at their residence or place of business additional copies of the unauthorized DVDs, various pieces of computer hardware, such as computers and DVD duplication machines; computer software; computer storage media, such as CD-ROMs and floppy diskettes; computer records; paper and electronic notes regarding piracy; and paper and electronic correspondence with others who engage in copyright piracy, within the meaning of Title 17, United States Code, Section 506(a), and Title 18, United States Code, Sections 2319 and 2319B. All of these items constitute evidence, contraband, fruits, or instrumentalities of violations of Title 17, United States Code, Section 506(a), and Title 18, United States Code, Sections 2319 and 2319B.

4. This affidavit is based in part upon undercover activities, audio and visual surveillance and other information gathered during the investigation. The information contained herein is based on my personal knowledge and experience, as well as information provided to me by other law enforcement personnel who have participated in the investigation described in this affidavit, law enforcement

personnel who have particular expertise in the subject matters of this investigation, and by industry experts.  This affidavit does not contain all of the information known to me regarding this investigation.  Your affiant has included in this affidavit facts which he believes are sufficient to support a probable cause finding for the issuance of the requested warrants and does not purport to include each and every matter of fact observed or known to me or other law enforcement agents involved in this investigation.

## DETAILS OF THE INVESTIGATION

5. On August 15, 2007, your Affiant and an undercover (UC) Special Agent of the Bureau of Alcohol, Tobacco and Firearms (ATF) were acting in an undercover capacity and were in the area of the 1700 block of First Street, NW, Washington, D.C. Both your Affiant and the UC observed a subject, later identified as **TONY DUGGER,** beside a black Mercedes 420, bearing DC tag: CK7788, which had an open trunk. This person identified himself as "Tony." Tony was talking to two U.S. Park Service employees who were in uniform.  Tony reached into the trunk of the Mercedes and retrieved what appeared to be unpackaged DVDs or CDs.  Tony was then observed giving these items to the two Park Service Employees in exchange for an unknown amount of U.S. Currency.  Your Affiant approached Tony and inquired if he was selling "bootleg" CDs.  Tony stated that they were DVD movies.  Tony provided your Affiant and the UC with a list of the movies he offered for sale out of the trunk of his Mercedes. Several of these items included movies that were at the time showing in the movie theaters and were not available on DVD.  Your Affiant advised Tony that he was very interested in several of these movie titles, especially the ones that were still in the theaters and not yet available on DVD.  Tony advised your Affiant and the UC that if we were interested in purchasing these movies in large quantities, he would provide them to us for "wholesale price."  Your Affiant expressed interest, but advised that we would purchase "Tranformers," "Knocked Up," and "Ratatouille" first to check out the quality.  Tony provided these DVD movies to your Affiant and the UC in exchange for fifteen dollars ($15.00).  Tony also provided the UC with his phone number (which was later determined to be a cellphone), email address and a list of numerous movies that he offered for sale.

6. Your affiant later inspected the DVD movies purchased from Tony.  The movies appeared to be counterfeit copies in violation of federal copyright infringement statutes.  For example, the movies were on recordable DVD-Rs, with the movie title handwritten on the top of each DVD-R.  Based on my experience, legitimate, authorized versions of DVDs are not distributed on DVD-Rs with hand-written titles.  In addition, at the time of the purchase, none of these movies was commercially available in DVD format.  In addition, an audience member was visible in "Knocked Up," indicating that the copy was created with a video recorder at a movie theater.

7. A computer check was conducted using the Washington Area Law Enforcement System (WALES) on the vehicle tag observed on the aforementioned Mercedes 420 and it revealed that the Mercedes 420 was registered to a subject identified as Tony Edward **DUGGER**, with a date of birth of May 9, 1960. In addition, a District of Columbia Department of Motor Vehicles photograph was obtained of Tony Edward **DUGGER** and your Affiant along with the UC both identified the subject in the DMV photograph, identified as Tony Edward **DUGGER,** as the same Tony they had purchased "Tranformers," "Knocked Up," and "Ratatouille" from on August 15, 2007. **DUGGER's** vehicle registration and driver's license carry an address of 1831 N. Capitol Street, NE, Washington, DC, which is believed to be a family residence and where, at least previously, **DUGGER's** mother resided.

8. On August 30, 2007, the UC sent an email to the email address **DUGGER** had provided: GrassrootsMedia@Verizon.net. The UC also provided Tony with his contact information, including the phone number to his undercover phone.

9. On September 3, 2007, the UC received a phone call from **DUGGER** who advised the UC that he received the email message and wanted to know what the UC wanted to "order." The UC advised **DUGGER** that your Affiant wanted to order "The Simpson Movie" and "Bourne Ultimatum." These were movies that were still in the theater at the time and had not been released to the public in DVDs or any other form of media. The UC advised **DUGGER** that he would have to talk to your Affiant first with respect to quantity and then get back to him.

10. On September 4, 2007, the UC called **DUGGER** at (202) 341-0269, which was the phone number that **DUGGER** had previously provided. The UC left a message ordering twenty-five (25) "The Simpson Movie" DVDs and twenty-five (25) "Bourne Ultimatum" DVDs. Later on that same date, the UC received a telephone message from **DUGGER** confirming that order.

11. On September 5, 2007, **DUGGER** called the UC and a time and location was agreed upon in order to make the transaction. On that same date, and at the agreed upon time, the UC along with your Affiant met with **DUGGER** in the area of the 100 block of U Street, NW, Washington, DC. **DUGGER** arrived in the aforementioned Mercedes 420 bearing DC tag CK7788, opened the trunk of the vehicle and pulled out a bag containing the requested DVD movies. The UC observed approximately two-hundred (200) other unknown titled DVDs in the trunk of the vehicle along with empty DVD plastic cases and paper slip-covers. The UC then counted the DVD movies that were ordered and found that there were only twenty (20) of each of the requested titles. **DUGGER** apologized and then agreed to sell the DVD movies for three dollars ($3.00) each, which **DUGGER** stated was wholesale price. Your Affiant paid **DUGGER** one-hundred and twenty dollars ($120.00) for the "Bourne Ultimatum" and "The Simpsons Movie" DVDs. The retail value of movies such as these, once released to the public on DVD, would be approximately twenty dollars each. The UC then advised **DUGGER** that

he worked at a large retail establishment and was able to get blank DVDs and other various electronic items such as flat screen televisions if he was interested in purchasing them. The UC and your Affiant suggested that these items were obtained illegally. **DUGGER** expressed interest and advised that he also had other "partners" that would be interested in purchasing such items.

12. Your Affiant and the UC inspected the DVDs purchased on September 5, 2007, which, like the previously purchased movies, appeared to be unauthorized copies. The movies were on DVD-Rs and the titles were hand-written on the tops of each disc. Your Affiant and the UC viewed a portion of the DVD "The Simpson's Movie" and found it to be of good quality. There were scenes in the movie where English subtitles were observed. "The Bourne Ultimatum" was also viewed and time code was embedded on the bottom of the screen and "Paramount Universal" was embedded on the top of the screen throughout the movie. Based on your Affiant's experience with film and counterfeit DVDs, visible time code is indicative of a version of a movie that was recorded before it was released to the theaters. One of the copies of "The Simpson's Move" and one of the copies of "The Bourne Ultimatum" purchased from **DUGGER** were submitted to the MPAA for analysis.

13. On or around September 20, 2007, the forensics results from MPAA were returned to your Affiant. It revealed that the DVD-R of "The Simpsons Movie" was captured using a video camera in a theater in Gromitz Germany. According to the MPAA, the DVD of "The Simpsons Movie" purchased from **DUGGER** was found to be an unauthorized copy. The MPAA also determined that the "Bourne Ultimatum" DVD as a copy of a "screener." A screener is a pre-theater release DVD that is sent by studios to a limited group of authorized recipients, such as film critics.

14. On September 24, 2007, the UC left a message on **DUGGER**'s phone, (202) 341-0269, advising him that we had some of the property that he was interested in, specifically four-hundred and twenty (420) blank Maxell DVD-Rs (hereinafter referred to as "bait property." Later that day, **DUGGER** left a message on the UC's undercover phone advising that he wanted to meet. **DUGGER** was contacted and your Affiant along with the UC met him in the vicinity of First Street and Rhode Island Avenue, NW, Washington, DC. **DUGGER** stated that he has been very busy with his "clients" and was trying to catch up on the "production of DVDs." The UC displayed the bait property and the UC and your Affiant agreed on forty dollars ($40.00) in exchange for the bait property. **DUGGER** advised that he wanted more bait property. The fair market value of the bait property was considerably more than the forty dollars **DUGGER** paid. Your Affiant took custody of the forty dollars and placed it into MPDC evidence.

15. On October 23, 2007 the UC received another phone call from **DUGGER** on his undercover phone. **DUGGER** advised the UC that he wanted to purchase more bait property. Later that day, your Affiant, along with the UC met with **DUGGER**

in the area of the 1700 block of First Street, NW, Washington, DC. The UC displayed 300 additional Maxell blank DVD-Rs (bait property). **DUGGER** purchased the bait property for thirty dollars ($30.00). Your Affiant suggested to **DUGGER** that the bait property was stolen. Your Affiant took custody of the thirty dollars and placed it on MPDC evidence. The fair market value of the bait property was considerably more than the thirty dollars **DUGGER** paid.

16. All transactions were recorded and placed in evidence with ATF. All transactions were also monitored by other members of ATF and Detective Brian Wise of the Metropolitan Police Department.

17. During the course of our conversations with **DUGGER** during the aforementioned transactions, **DUGGER** explained that he was in the business of selling DVD movies on a regular basis. He advised both your Affiant and the UC that he had other subjects who were involved in "Camming" (using a camcorder to record the motion pictures in the theaters). He stated that the equipment he had access to was of "high quality." In addition, when your Affiant expressed a desire to purchase single DVDs and "burn" them myself (make additional copies of the DVD for resale), **DUGGER** advised me against it by stating that it would take me days and that he had several "burners" and could finish the process quicker.

18. After their initial meeting, the UC and **DUGGER** began to correspond with one another via email in addition to their in-person and telephone exchanges. The email correspondence was initiated by the UC who sent an email message from an undercover Hotmail account to the email address which appeared at the top of the movie list provided by **DUGGER** during their meeting on August 15, 2007 (i.e., grassrootsmedia@verizon.net).

19. A subpoena was issued to Verizon for the Digital Subscriber Line (DSL) associated with **DUGGER**'s email account. In September 2007, Verizon provided information that revealed the service address for that account was **1826 24th Street, Northeast, Washington, DC Apartment #102**. The information provided by Verizon also indicated that the subscriber for that account was Tony **DUGGER,** the user name is "tonydugger," and that alternate subaccount names associated with the account are "tonydugger47" and "grassrootsmedia. This information confirms that the email address that appears on the movie list and that was used to correspond with the UC concerning the sale of counterfeit DVDs was associated with a broadband DSL account physically wired to DUGGER's DSL account address, 1826 24th Street, Northeast, Washington, DC Apartment #102.

20. The information obtained from Verizon above lends credence to the conclusion that **DUGGER** sent the messages that the UC received from grassrootsmedia@verizon.net concerning the sale of counterfeit commercial DVD's. However, additional information was subsequently obtained that confirms a computer located at the DSL service address was actually used to send the email messages that the UC received from grassrootsmedia@verizon.net. On October

5

26, 2007, the UC received another list of movies via email that **DUGGER** was offering for wholesale on DVD through Grass Roots Media. This list included several titles that were still in the movie theaters and not yet available for distribution on DVD or any other form of media other than movie theaters. An additional subpoena was issued to Verizon for logs of Internet Protocol (IP) addresses that had been assigned to the DSL account that receives service at **1826 24th Street, Northeast, Washington, DC Apartment #102** for the period that included October 26, 2007[1]. A comparison of these IP addresses could then be made against the sender's IP address for the email message sent from grassrootsmedia@verizon.net to the UC's email account on October 26, 2007.

21. The email message in questioned contained information in the "header" of the message indicating that the sender's computer was assigned the IP address **141.156.185.143** at the moment the message was transmitted on October 26, 2007. The data obtained from Verizon in response to the subpoena indicated that at the time that the message was sent on October 26, 2007, **DUGGER's** DSL account had been assigned the IP address **141.156.185.143**. This is the same IP address that appears in the header of the message as the sender's IP address. The fact that **DUGGER's** DSL account was assigned the same IP address that appears as the sender's IP address in the message sent from grassrootsmedia@verizon.net at the time the message was sent, confirms that a computer located at the DSL service address, **1826 24th Street, Northeast, Apartment #102**, transmitted the message to the UC's email account.

22. The fact that **DUGGER** sold the UC a movie that was, according to the MPAA, cammed in Germany (i.e., recorded using a digital camcorder inside of a theater), is a strong indication that he downloads via the internet the movies that he offers

---

1. Computers connected to the Internet are identified by addresses. Internet Addresses take on several forms, including IP addresses. An IP address is a unique numerical address identifying each computer on the Internet. IP addresses are conventionally written in the dot-punctuated form *num1.num2.num3.num4* (*e.g.,* **141.156.185.143**). There are two types of IP addresses -- dynamic and static. A static IP address is one that is permanently assigned to a given computer on a network. With dynamic IP addressing, however, each time a computer establishes an Internet connection, that computer is assigned a different IP address. For example, each time a Verizon customer with a dynamic IP address connects to the Verizon network and establishes an Internet connection, he or she is randomly assigned an IP address from the block of IP addresses controlled by Verizon. When the customer ends the session, the temporarily assigned IP address is placed back into the pool of IP addresses available for temporary assignment to other Verizon subscribers. Customers using broadband Internet services, including the type of DSL service that the subject obtained from Verizon in this case, are typically assigned IP addresses that are technically dynamic, but which may remain unchanged for longer periods of time -- a week or more.

6

for sale. Such downloads make take place via organized groups of copyright infringers (i.e., pirates) or increasingly through the use of peer-to-peer (P2P) software programs. Given the size of the files involved in the production of counterfeit DVD movies, broadband internet access, such as DSL service, is typically used to transfer the files. Given that **DUGGER** subscribes to broadband DSL service at the address on **1826 24th Street, Northeast, Washington, DC Apartment #102** and that he has used a computer at that location to send email to the UC concerning the sale of counterfeit DVDs, it is also likely that **DUGGER** downloads the movies from the Internet and produces copies to distribute by burning them onto DVDs at the same location.

23. On November 21, 2007 your Affiant along with the UC and Detective Brian Wise of the Metropolitan Police Department went to 1826 24th Street, Northeast, Washington, DC and observed the black Mercedes bearing DC tag CK7788, registered to **DUGGER** parked in front of the building.

24. On December 11, 2007, **DUGGER** called the UC and asked the UC when he wanted to get together because he had a "new movie" and he also wanted to purchase more blank DVDs from the UC. **DUGGER** advised the UC that he currently had "The Perfect Holiday," a movie that was not in theatrical release at the time. **DUGGER** stated that "The Perfect Holiday" was "crystal clear" and better than "American Gangster." The UC advised **DUGGER** that he was interested and would get back to him.

25. Statutes relevant to this investigation include, but are not limited to, the following:

*Criminal Copyright Infringement*

Title 17, United States Code, Sections 506(a), (b) provides, in pertinent part:

**(a) Criminal Infringement**—(1) In general–Any person who willfully infringes a copyright shall be punished as provided under section 2319 of title 18, if the infringement was committed–

  (A) for purposes of commercial advantage or private financial gain;

  (B) by the reproduction or distribution, including by electronic means, during any 180-day period, of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than $1,000; or

  (C) by the distribution of a work being prepared for commercial distribution, by making it available on a computer network accessible to members of the public, if such person knew or should have known that the work was intended for commercial distribution.

**(b) Forfeiture and Destruction.**— When any person is convicted of any violation of subsection (a), the court in its judgment of conviction shall, in addition to the penalty

therein prescribed, order the forfeiture and destruction or other disposition of all infringing copies or phonorecords and all implements, devices, or equipment used in the manufacture of such infringing copies or phonorecords.

### *Penalties For Criminal Copyright Infringement*

The penalties for violations of Title 17, United States Code, Sections 506, are set forth in Title 18, United States Code, Sections 2319(b), (c), (d), which provide in pertinent part:

(b) Any person who commits an offense under section 506(a)(1)(A) of title 17

> (1) shall be imprisoned not more than 5 years, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution, including by electronic means, during any 180-day period, of at least 10 copies or phonorecords, of 1 or more copyrighted works, which have a total retail value of more than $2,500 ...

(c) Any person who commits an offense under section 506(a)(1)(B) of title 17, United States Code –

> (1) shall be imprisoned not more than 3 years, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution of 10 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of $2,500 or more;
>
> ...
>
> (3) shall be imprisoned not more than 1 year, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than $1,000.

(d) Any person who commits an offense under section 506(a)(1)(C) of title 17, United States Code –

> (1) shall be imprisoned not more than 3 years, fined under this title, or both;
>
> (2) shall be imprisoned not more than 5 years, fined under this title, or both, if the offense was committed for purposes of commercial advantage or private financial gain ...

### *Unauthorized Recording of Motion Pictures in a Motion Picture Exhibition Facility*

Title 18, United States Code, Section 2319B provides, in pertinent part:

(a) Offense.--Any person who, without the authorization of the copyright owner, knowingly uses or attempts to use an audiovisual recording device to transmit or make a copy of a motion picture or other audiovisual work protected under title 17, or any part thereof, from a performance of such work in a motion picture exhibition facility, shall–

> (1) be imprisoned for not more than 3 years, fined under this title, or both ...

**PROBABLE CAUSE**

26. Based on the information outlined above, the undersigned submits that there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitute evidence of violations of Title 18, United States Code, Section 2319 and Title 17, United States Code, Section 506 (Criminal copyright infringement); Title 18, United States Code, Section 2319B (Unauthorized recording of motion pictures in a motion picture exhibition facility); and Title 18, United States Code, Section 2 (Aiding and Abetting the foregoing offenses), and will be found at the premises to be searched, as described in Attachment A.

27. Your Affiant respectfully requests that a Search Warrant be issued for the premises described in Attachment A for the seizure of the items submitted in Attachment B.

28. Your Affiant respectfully requests that a Search Warrant be issued for the vehicle described in Attachment A for the seizure of the items submitted in Attachment B.

29. Your affiant believes that there is probable cause to believe that **TONY EDWARD DUGGER, PDID: 488194,** did engage in activities that constitute violations of Title 18, United States Code, Section 2319 and Title 17, United States Code, Section 506 (Criminal copyright infringement) and respectfully requests an arrest warrant for Criminal Copyright Infringement.

**COMPUTER DATA**

30. Based upon my training and experience, and on information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that for a number of reasons it is often not possible to search computer equipment and storage devices for data during the search of the premises. Those reasons include the following:

    a. Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. It is impracticable to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search of all of the many types of computer hardware and software in use today. Moreover, it may be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system to be searched.

    b. Searching a computer system is a precise, scientific procedure designed to maintain the integrity of the evidence while recovering "hidden," erased,

      compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

  c. The volume of data stored on many computer systems and storage devices is often too large to permit a thorough search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing eighty gigabytes of data are now commonplace in desktop computers.

  d. Computer users can use a number of methods to conceal data within computer equipment and storage devices, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also conceal data by using encryption; a password or device, such as a "dongle" or "keycard," is then necessary to decrypt the data into readable form. Computer users can also conceal data by an artifice known as "steganography," a means of hiding text within an image file. Because these and other concealment may be employed by a computer user, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or the instrumentality of a crime.

In light of these concerns, your Affiant hereby requests the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.

31. The aforementioned facts provide evidence of probable cause to believe that the items described in Attachment B will be found at the premises identified below and described in Attachment A. The computer hardware and related materials described in Attachment B constitute not only evidence, contraband, fruits, and instrumentalities of these offenses, but also constitute "implements, devices, or equipment used in the distribution of" infringing copies of copyrighted works, and

10

are thereby subject to criminal forfeiture and destruction or other disposition pursuant to 17 U.S.C. § 506(b).

_____
Detective David Swinson
Metropolitan Police Department
Special Investigations Bureau
Intelligence Section

Subscribed and sworn to me this_____day of December, 2007

_____
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A – PREMISES TO BE SEARCHED**

**1826 24th Street, Northeast, Apartment #102, Washington DC**

1826 24th Street, Northeast, Washington, DC is described as a red brick multi-story apartment complex. The front entrance door is brown in color and placard bearing the numbers, "1 8 2 6" is affixed on the exterior wall above the door. Apartment # 102 is located inside 1826 24th Street, Northeast, Washington, DC and the door is brown in color.

**1997 Four Door Mercedes 420 bearing DC Tag: CK7788**

Described as a black four door Mercedes 420 bearing the VIN: **WDBGA43G1VA335912** and registered to Tony Edward **DUGGER**, PDID: 488194

**Attachment B**

**ITEMS TO BE SEIZED**

Items evidencing violations of Title 18, United States Code, Section 2319 and Title 17, United States Code, Section 506 (Criminal copyright infringement); Title 18, United States Code, Section 2319B (Unauthorized recording of motion pictures in a motion picture exhibition facility); Title 18, United States Code, Section 2 (Aiding and Abetting the foregoing offenses), including but not limited to the following:

   1.  Intellectual property protected by copyright, including but not limited to motion pictures and software, stored in whatever format on whatever media, including but not limited to computer files stored on any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants.

   2.  Records, in whatever form, of operations, sales, billing, distribution, marketing, and income related to copyright infringement.

   3.  Records, in whatever form, regarding communications between individuals relating to copyright infringement, including but not limited to access logs, IRC logs, and instant messaging logs, electronic mail, mail and any other writings.

   4.  Hardware, documentation, packaging, labels, and/or software related to copyright infringement, including audiovisual recording devices for recording copyrighted movies in movie theaters.

   5.  Records, in whatever form, of user names and passwords to secure communication services.

   6.  Computer hardware, meaning any and all computer equipment and peripheral devices. Included within the definition of computer hardware is any electronic device capable of data processing (such as central processing units, laptop or notebook computers, personal digital assistants, and wireless communication devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media); related communications devices (such as modems, cables and connections); storage media, defined below; and security devices, also defined below.

   7.  Computer software, meaning any and all data, information, instructions, programs, or program codes, stored in the form of electronic, magnetic, optical, or other media, which is capable of being interpreted by a computer or its related components.  Computer software may also include data, data fragments, or control characters integral to the operation of computer software, such as operating systems software, applications software, utility programs, compilers,

interpreters, communications software, and other programming used or intended to be used to communicate with computer components.

8. Computer-related documentation, meaning any written, recorded, printed, or electronically stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

9. Data security devices, meaning any devices, programs, or data, whether themselves in the nature of hardware or software, that can be used or are designed to be used to restrict access to, or to facilitate concealment of, any computer hardware, computer software, computer-related documentation, or electronic data records. Such items include, but are not limited to, user names and passwords; data security hardware (such as encryption devices, chips, and circuit boards); data security software or information (such as test keys and encryption codes); similar information that is required to access computer programs or data or to otherwise render programs or data into usable form; and any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks).

10. Storage media of any kind whatsoever, whether blank or containing data, including any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants.

11. Records, in whatever form, of personal and business activities relating to the operation and ownership of the computer systems, such as telephone records, notes, books, diaries, and reference materials.

12. Cellular telephones and telephone records under the control of Tony **DUGGER.**

13. Records, in whatever form, pertaining to accounts held with Internet Service Providers or of Internet use.

14. Evidence of occupancy and/or use of the premises and vehicle by Tony **DUGGER**, including but not limited to: records, documents, receipts, photographs, mail matter, titles, keys, registration to include the opening of safes and lock boxes.

15. Financial documents, including but not limited to bank statements.

16. Cash and other suspected proceeds of violations of Title 18, United States Code, Section 2319 and Title 17, United States Code, Section 506 (Criminal copyright infringement); Title 18, United States Code, Section 2319B (Unauthorized recording of motion pictures in a motion picture exhibition facility); and Title 18, United States Code, Section 2 (Aiding and Abetting the foregoing offenses).